UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
ENNETTE GUZMAN,

    Plaintiff,

  - against -

CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CORRECTION, MARTIN F. HORN,
individually and in his capacity as
Commissioner of the New York City
Department of Correction, DEPUTY WARDEN
FELINE BREELAND and DOCTOR THEO,

    Defendants.
--------------------------------------X
MATSUMOTO, UNITED STATES DISTRICT JUDGE:

FOR ELECTRONIC
PUBLICATION ONLY

**MEMORANDUM & ORDER**

06-CV-5832(KAM)(LB)

   Plaintiff Ennette Guzman ("plaintiff") brings this action

against the City of New York, the New York City Department of

Correction ("DOC"), and individual defendants employed by the

DOC, alleging employment discrimination in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et*

*seq.*, as amended by the Pregnancy Discrimination Act, 42 U.S.C.

§ 2000e(k) ("Title VII"), New York State Human Rights Law, N.Y.

Exec. Law § 296 ("NYSHRL"), and New York City Human Rights Law,

N.Y.C. Administrative Code § 8-107 ("NYCHRL"). (*See* ECF No. 30,

Second Amended Complaint ("Second Am. Compl.") at 12-15.)

Plaintiff alleges that she was discriminated against based on

her gender and pregnancy, and that she was retaliated against

for filing complaints of discrimination against various DOC

employees. (*See* Second Am. Compl. at 2-3.) In support of her

gender and pregnancy discrimination claims, plaintiff alleges

that female correction officers are assigned less preferential

tours, facilities, and posts, DOC failed to assign her to a

steady tour when she became pregnant, Deputy Warden Feline

Breeland ("Breeland") assigned her to a post inappropriate for

pregnant women, DOC denied her requests for a transfer and

steady posts, and Dr. Peter Theo ("Dr. Theo") and DOC failed to

inform plaintiff about the appropriate procedures to remove a

firearm restriction. (*See* Second Am. Compl. at 6-11; *see also*

ECF No. 64, Memorandum in Opposition to Defendants' Motion for

Summary Judgment ("Pl. Mem.") at 1-2.)[1]

Defendants now move for summary judgment, pursuant to

Federal Rule of Civil Procedure 56, seeking dismissal of

plaintiff's action.  For the reasons set forth herein,

defendants' motion is granted in part and denied in part.[2]

## FACTUAL BACKGROUND

The following facts, taken from the parties'

statements pursuant to Local Civil Rule 56.1 and the supporting

evidence submitted therewith, are undisputed unless otherwise

---

[1] Plaintiff originally brought claims alleging discriminatory failure to
promote her to Captain and discriminatory practices by Dr. Lisa Rosenberg.
On May 26, 2009, plaintiff informed the court of her intention to dismiss
these two claims.  (*See* ECF Docket, 5/26/2009 Minute Entry.)  Even though a
stipulation of dismissal was never filed, it is clear from plaintiff's
submissions that these claims have been abandoned and they are deemed
dismissed.

[2] The court is grateful for the efforts of Magistrate Judge Bloom and her
chambers in the preparation of this Memorandum and Order.

indicated.  The court has considered whether the parties have proffered admissible evidence in support of their positions and has viewed the facts in the light most favorable to the nonmoving plaintiff.

## A. Plaintiff's Employment History

Plaintiff Ennette Guzman has been employed by the DOC since 2002.  (*See* ECF No. 68-3, Zinaman Declaration, Ex. B, Guzman Deposition Transcript ("Pl. Dep.") 19:21-20:7.)  Starting in 2003, plaintiff has worked as a correction officer at the Robert N. Davoren Center ("RNDC")[3] on Rikers Island.  (*See* Pl. Dep. 29:6-8.)

### 1. Transfer Requests

Plaintiff alleges that the RNDC jail, which houses men and adolescent inmates, is a dangerous facility for correction officers because, according to plaintiff, "[a]dolescents are notoriously violent and disobedient inmates."  (*See* ECF No. 65, Guzman Affidavit in Opposition to Defendants' Motion for Summary Judgment ("Pl. Aff.") ¶ 38.)  Plaintiff also alleges that, because of these dangerous conditions, RNDC is a "non preferred facilit[y]" and is "widely regarded as a difficult post."  (*See* Second Am. Compl. at 6-7.)

---

[3] RNDC was formerly known as ARDC.  (*See* Pl. Dep. 40:4-7; Zinaman Declaration, Ex. E, Breeland Deposition Transcript ("Breeland Dep.") 8:4-10.)  The evidence refers to RNDC and ARDC interchangeably.  In this opinion, the court will refer to the facility by its current name, RNDC.

Plaintiff submitted a "Request for Transfer"
application in July of 2007,[4] requesting a transfer from RNDC on
Rikers Island to other DOC facilities, including other detention
centers in Manhattan and Brooklyn. (Pl. Aff., Ex. 10, Request
for Transfer; *see also* Pl. Aff. ¶ 38.) Plaintiff indicated on
the form that the reason for her transfer request was a "closer
commute." (Pl. Aff., Ex. 10, Request for Transfer.) This
request for transfer was denied. (*See* ECF No. 68-2, Defendants'
Rule 56.1 Statement ("Def. 56.1 Stmt.") ¶ 97; Pl. Aff. ¶ 39.)
Plaintiff's commanding officer indicated that the request was
"not recommended" because "[a]ttendance should be better." (Pl.
Aff., Ex. 10, Request for Transfer; Def. 56.1 Stmt. ¶ 97.)

## 2. Post Assignments and Steady Post Requests

From 2003 until 2007, plaintiff's assigned post was
primarily the B-Post Housing Area ("Housing Area Post") at RNDC.
(*See* Def. 56.1 Stmt. ¶ 85; Pl. Dep. 29:11.) The Housing Area is
where inmates live, and the officer assigned to this post
supervises the inmates for the duration of his or her tour.
(Def. 56.1 Stmt. ¶ 85.) The Housing Area Post is generally the

---

[4] The evidence also indicates that plaintiff submitted two other requests for
transfers, one in July of 2006 and another in August of 2008. (*See* Zinaman
Declaration, Ex. T, Request for Transfer; Pl. Aff., Ex. 10, Request for
Transfer.) Plaintiff indicated in her affidavit that she has no recollection
of the July 2006 request. (*See* Pl. Aff. ¶ 38 n.2.) Plaintiff's affidavit
refers to the August 2008 request, but presents no evidence of the outcome of
this request. (*See* Pl. Aff. ¶¶ 38-39.) Plaintiff does not appear to claim
that either the 2006 or 2008 transfer request is related to the
discrimination and retaliation alleged in her complaint. Thus, the court
considers only the 2007 transfer request.

post to which correction officers are first assigned after completing their training at the Academy. (*See id.;* Pl. Dep. 30:9-12.) Plaintiff describes that in the Housing Area Post she was "locked in" with the 30 to 60[5] inmates she was responsible for supervising, attending to their needs, supervising showers and meals, and at times even dealing with inmates who committed suicide by hanging themselves from the cell bars. (*See* Pl. Aff. ¶ 40; Pl. Dep. 33:4-12.) For these reasons, plaintiff alleges that the "risk of violence and injury was the highest" for correction officers working the Housing Area Post. (*See* Pl. Aff. ¶ 41.)

Plaintiff alleges she applied for six different steady posts in 2007: Mental Health Officer, Clinic, Bus Escort, North South Corridor, Corridor 3 & 5, and Corridor Relief. (*See* Pl. Aff. ¶ 40; *see also* Pl. Dep. 30:17-22.) Plaintiff considered the Mental Health Officer, Clinic and Bus Escort Posts as "preferred posts" because they involved little to no inmate contact or supervision, "sometimes as little as one or two inmates at a time," and thus presented less risk of violence or

---

[5] Plaintiff testified in her deposition that the Housing Area Post required her to supervise between "[30] to 60 inmates at a time." (Pl. Dep. 33:5.) Plaintiff's affidavit, however, alleges that the Housing Area Post required her to supervise "between 60 and 120 inmates." (Pl. Aff. ¶ 40.) Whether plaintiff supervised 30 to 60, or 60 to 120 inmates in the Housing Area Post is not a material fact and does not affect the court's evaluation of the case. The relevant fact is that at the Housing Area Post plaintiff was required to supervise a large number of inmates during the entire shift, a fact which is undisputed.

injury.  (*See* Pl. Aff. ¶ 41; *see also* Pl. Dep. 32:14-15, 33:21-24, 34:5-18.)  Plaintiff did not consider the corridor posts as "preferred" because they still required some inmate contact and supervision.  (*See* Pl. Dep. 32:10-12; *see also* Pl. Aff. ¶¶ 40-41.)  Nonetheless, plaintiff considered the corridor posts to be "much better duty" than the Housing Area Post because the inmate contact and supervision was limited to securing corridors as inmates were being escorted by other officers, rather than being "locked in with [the inmates]" during the entirety of her tour. (*See* Pl. Aff. ¶ 40; Pl. Dep. 33:4-17.)  Defendants claim that plaintiff applied only for four steady posts, the Mental Health Officer,[6] two Corridor Relief, and Meal Relief Posts.[7]  (Def. 56.1 Stmt. ¶ 87.)

The Mental Health Officer Post was awarded in June 26, 2007 to Officer Hardayal, an officer with over ten years of seniority over plaintiff.  (*See* Pl. Aff., Ex. 11, Steady Post Awards; Zinaman Declaration, Ex. O, Steady Post Awards.) Plaintiff alleges that the Clinic and Bus Escort Posts were

---

[6] Defendants refer to this post as the "Clinic" Post.  (Def. 56.1 Stmt. ¶ 87.) However, it is clear that defendants are referring to the Mental Health Officer Post.  Defendants cite to Exhibit O of the Zinaman Declaration, which contains several post assignment memoranda, as evidence of plaintiff's application to the "Clinic" Post.  Exhibit O shows that the post referred to is the "Mental Health Officer" Post.  (*See* Zinaman Declaration, Ex. O, Steady Post Assignments.)

[7] While plaintiff mentions the Meal Relief Post application in her deposition, she does not allege in any of her papers that the denial of this assignment, which she requested in June of 2006, was discriminatory.  Therefore, the Meal Relief Post application is not relevant here.

never awarded to any particular officer.  (*See* Pl. Aff. ¶ 42
n.3; Pl. Dep. 34:19-21.)  Plaintiff also alleges, without
specifying a date, that the North South Corridor Post was
awarded to Officer Gomez, a male officer with less seniority
than plaintiff.  (*See* Pl. Aff. ¶¶ 42 n.3, 43.)  Three Corridor
Relief Posts were awarded on October 9, 2007, one of which was
awarded to plaintiff.  (*See* Pl. Aff., Ex. 11, Steady Post
Awards.)  Finally, plaintiff presents evidence showing that, on
that same day, the Corridor 3 & 5 Post was awarded to Officer
Raboy, an officer with over ten years of seniority over
plaintiff.  (*See* Pl. Aff., Ex. 11, Steady Post Awards.)

**B. The Circumstances of the July 2005 Events**

          Plaintiff had a miscarriage in February of 2005.  (*See*
Def. 56.1 Stmt. ¶ 7; Pl. Aff. ¶ 3; Pl. Dep. 62:20-63:2.)  A few
months later, in April of 2005, plaintiff learned that she was
pregnant again.  (*See* Def. 56.1 Stmt. ¶ 8; Pl. Aff. ¶ 3.)  Based
on her doctor's recommendation, plaintiff was out on sick leave
during the first months of her April 2005 pregnancy.  (*See* Def.
56.1 Stmt. ¶ 11; Pl. Aff. ¶ 3; Pl. Aff., Ex. 1, Treating
Physician Summary Report.)  During this time, plaintiff made
regular visits to the Health Management Division ("HMD") for
routine evaluations.  (*See* Pl. Aff. ¶ 3; *see also* Pl. Aff., Ex.
2, Patient's Progress Notes.)  Plaintiff was cleared to return
to light duty on "MMR III" status on June 28, 2005, when she was

approximately five months pregnant. (*See* Pl. Aff. ¶ 6; Pl. Aff., Ex. 2, Patient's Progress Notes, HMD 00189.) The MMR III designation means that the officer is to have no inmate contact or supervision. (Def. 56.1 Stmt. ¶ 12.) Pursuant to DOC policy, all pregnant officers are designated MMR III status. (*Id.*) Further, plaintiff states that it is DOC policy to automatically assign pregnant officers to steady tours, but such policy, if it exists, is not in the record before this court. (*See* Pl. Aff. ¶ 7.) A steady tour means the officer works the same hours every day, as opposed to being "on the wheel" and assigned to shifts randomly. (*See id.* at ¶ 6.)

Plaintiff returned to work at RNDC on MMR III status on July 2, 2005 and was assigned to work the 7-3 tour. (*See* Def. 56.1 Stmt. ¶ 13; Pl. Aff. ¶ 6; Pl. Dep. 48:15-16.) Despite the alleged DOC policy regarding steady tours for pregnant officers, plaintiff was "on the wheel" at this time, meaning she had not been automatically assigned a steady tour. (*See* Pl. Aff. ¶ 6; *see also* Pl. Dep. 48:14-18.) As a result, on July 7, 2005, plaintiff was reassigned from the 7-3 tour to the midnight tour, for which she would report in at 11:00 p.m. on July 7 and work until 7:30 a.m. on July 8. (*See* Def. 56.1 Stmt. ¶ 24; Pl. Aff. ¶ 8; Pl. Dep. 48:10-18.) Upon learning her assigned tour on July 7, 2005, plaintiff contacted the personnel office that day to remedy the failure to assign her a steady tour. (*See* Pl.

Aff. ¶ 8; Pl. Dep. 48:14-16, 49:4-13.)  The personnel office
informed plaintiff that only HMD could approve a steady tour
assignment.  (*See* Pl. Aff. ¶ 8; Pl. Dep. 49:4-15.)  Plaintiff
then attempted to contact Nurse Rhaney, the HMD nurse in charge
of pregnant correction officers, to request a steady tour.  (*See*
Def. 56.1 Stmt. ¶ 26; Pl. Aff. ¶ 9; Pl. Dep. 49:1-4.)  However,
plaintiff was unable to reach Nurse Rhaney before she was
required to report to the midnight tour at RNDC.  (*See* Def. 56.1
Stmt. ¶ 27; Pl. Aff. ¶ 9; *see also* Pl. Dep. 49:9-10.)

Plaintiff reported to her assigned midnight tour on
July 7, 2005.  (*See* Def. 56.1 Stmt. ¶ 28; Pl. Aff. ¶9; Pl. Dep.
50:19-20, 51:3-9.)  Prior to the commencement of the tour,
plaintiff alleges that defendant Breeland, the tour commander
that night, saw her with another officer as Breeland walked past
the post where plaintiff was sitting.  (*See* Pl. Dep. 52:15-16,
54:6-55:18.)  Plaintiff states she was five months pregnant,
"definitely showing," and wearing maternity clothes that night.
(*See* Pl. Aff. ¶ 10; Pl. Dep. 50:20-23, 53:12-16.)  After roll
call, Captain Rivera, the Central Control Room captain, assigned
plaintiff to work in the General Office, a post with no inmate
contact or supervision, in compliance with the MMR III status
requirements.  (Def. 56.1 Stmt. ¶ 29; Pl. Aff. ¶ 10; Pl. Dep.
51:21-24.)  According to plaintiff, the General Office is an
air-conditioned room with an adjacent bathroom.  (*See* Pl. Aff. ¶

10; Pl. Dep. 53:3-5.)  Later that night, Captain Rivera informed
plaintiff that Breeland, the tour commander, had requested that
plaintiff be reassigned to Control II so that the Control II
officer could relieve another officer on overtime at an inmate
contact post.  (*See* Def. 56.1 Stmt. ¶¶ 30, 33, 35; Pl. Aff. ¶
11; Pl. Dep. 52:15-21.)  Plaintiff alleges Breeland asked
Captain Rivera for the "pregnant officer" to be sent to Control
II.  (*See* Pl. Aff. ¶ 11; Pl. Dep. 52:16-17.)

Plaintiff described Control II as a plexiglass
enclosure at the intersection of several gates, without air-
conditioning, and no adjacent bathroom.  (Pl. Aff. ¶ 12; Pl.
Dep. 52:25-53:4, 54:17-21, 56:4-11.)  An officer assigned to
Control II must request the Central Control Room to send a
relief officer before leaving the post to go to the bathroom
which, according to plaintiff, is several minutes away.  (Pl.
Aff. ¶ 12; Pl. Dep. 56:4-9.)  There is no inmate contact or
supervision at Control II, and therefore Control II is
designated an MMR III post.  (Def. 56.1 Stmt. ¶¶ 37, 38; Pl.
Aff. ¶¶ 12, 18; Pl. Dep. 74:15-17.)  Nonetheless, plaintiff
asserts that Control II is not assigned to pregnant officers,
despite the assignments' MMR III designation, due to the lack of
air-conditioning and bathroom access.  (*See* Pl. Aff. ¶ 12; Pl.
Dep. 55:25-56:2.)

Plaintiff protested her reassignment to Control II to Captain Rivera, who purportedly agreed with plaintiff that Control II was not an appropriate post assignment for a pregnant officer. (*See* Pl. Aff. ¶ 13; Pl. Dep. 57:12-24.) Plaintiff stated that Captain Rivera said he would speak with Breeland to explain to her why assigning plaintiff to Control II was not appropriate. (*See id.*) However, according to plaintiff, Captain Rivera subsequently called plaintiff and explained that Breeland was insisting that plaintiff go to Control II even though she was pregnant. (*See id.*; *see also* Pl. Dep. 58:17-19.)

Plaintiff alleges that the reassignment to Control II caused her to become "stressed out." (*See* Def. 56.1 Stmt. ¶ 45; Pl. Aff. ¶ 14; Pl. Dep. 58:24-25.) Plaintiff also alleges she began feeling cramps and stinging pains in her back. (*See* Def. 56.1 Stmt. ¶ 44; Pl. Aff. ¶ 15; Pl. Dep. 58:20-22.) Instead of assuming the Control II post, plaintiff called in sick and went home. (*See* Def. 56.1 Stmt. ¶ 46; Pl. Aff. ¶ 15; Pl. Dep. 61:2-7.) Later that day, plaintiff states she was taken to the emergency room, where she had her second miscarriage. (*See* Pl. Aff. ¶ 15; Pl. Dep. 61:25-62:13.)

**C. Firearm Restriction**

Following the second miscarriage in July of 2005, plaintiff became depressed and anxious. (*See* Pl. Aff. ¶ 24; *see also* Def. 56.1 Stmt. ¶ 68.) Plaintiff began seeing Dr. Theo,

the HMD psychologist, due to her depression and anxiety. (*See* Def. 56.1 Stmt. ¶ 69; Pl. Dep. 83:12-13.) Plaintiff alleges that during one these visits to HMD, Dr. Theo declared her "psychologically unfit" and changed her ID to a "no firearm" designation. (*See* Pl. Aff. ¶ 23; Pl. Dep. 83:19-21, 84:23-85:2.) The parties disagree about when the "no firearm" designation was made. Plaintiff alleges in her affidavit that Dr. Theo changed her ID to "no firearm" in September 2005. (*See* Pl. Aff. ¶ 23; Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Pl. 56.1 Stmt.") ¶ 74.) During her deposition, however, plaintiff testified that Dr. Theo changed her ID to "no firearm" during their last visit (*see* Pl. Dep. 83:19-23), which HMD records indicate was in late March 2006 (*see* Pl. Aff., Ex. 2, Patient's Progress Notes, HMD 00184.) Finally, defendants seem to allege that the "no firearm" designation was made in April of 2006. (*See* Def. 56.1 Stmt. ¶ 74.) Plaintiff presented the HMD Patient's Progress Notes containing Dr. Theo's entries for each of plaintiff's visits as evidence of the date when the "no firearm" designation was made. (*See* Pl. Aff., Ex. 2, Patient's Progress Notes.) The court has been unable to determine from the record evidence the date of the "no firearm" designation, or any other information regarding this matter. However, the parties do not dispute that a "no

firearm" designation was made at some time during the relevant period.

Plaintiff became pregnant again in November of 2005, but had a third miscarriage in January of 2006. (Def. 56.1 Stmt. ¶ 9; Pl. Dep. 63:16-18.) HMD records show that plaintiff continued to complain of depression and anxiety from July 2005, after her second miscarriage, until March 2006. (Def. 56.1 Stmt. ¶ 68; Zinaman Declaraion, Exs. L, N, Treating Physician's Summary Reports.) As a result of her pregnancies and miscarriages, and the psychological and physical sequelae, plaintiff was either out sick or on light duty until May of 2006. (*See* Def. 56.1 Stmt. ¶¶ 70-73; Zinaman Declaration, Exs. L, N, Treating Physician's Summary Reports.) Plaintiff continued to see Dr. Theo for her depression and anxiety, and the HMD records show that Dr. Theo cleared plaintiff for full duty, pending medical clearance, on February 15, 2006. (*See* Pl. Aff., Ex. 2, Patient's Progress Notes, HMD 00199; Pl. Aff. ¶ 29.) Plaintiff alleges in her affidavit that during this visit on February 15, 2006, she asked Dr. Theo how to remove the "no firearm" designation from her ID, and that Dr. Theo "seemed not to know and suggested that [plaintiff] talk to someone out front at HMD." (Pl. Aff. ¶ 29.)

Plaintiff returned to full duty in May of 2006. (*See* Def. 56.1 Stmt. ¶¶ 58, 73.) Plaintiff asserts that during May

2006, she attended a firearms training, an annual requirement for correction officers, but was turned away because of the "no firearm" designation on her ID. (*See* Pl. Aff. ¶ 30.) Plaintiff states that when she informed the personnel office at RNDC that she was unable to complete the firearms training as requested, the administrative captain "wrote [her] up" for not informing the office about the firearm restriction, but failed to inform plaintiff what was needed to change her ID. (*Id.*) After this incident, plaintiff states that she wrote a letter to the warden at RNDC requesting that the "no firearm" restriction be lifted, but did not receive any information in response. (*See* Pl. Aff. ¶¶ 31-32.) A copy of plaintiff's letter is not provided. Plaintiff concedes, both in her affidavit and during her deposition, that she did eventually learn from other sources that she was required to present a psychological evaluation from an outside doctor in order to lift the "no firearm" restriction on her ID. (*See* Pl. Aff. ¶¶ 28, 32; Pl. Dep. 101:18-23.)

**D. Complaints of Discrimination**

Plaintiff filed a complaint of discrimination against Breeland with the DOC Office of Equal Employment Opportunity ("DOC's EEO Office") on October 4, 2005. (*See* Def. 56.1 Stmt. ¶ 50; Pl. Aff. ¶ 44.) The complaint, signed by plaintiff and dated October 4, 2005, alleged that Breeland discriminated against plaintiff in reassigning her to Control II on July 8,

2005. (*See* Pl. Aff., Ex. 12, Complaint of Discrimination; *see also* Def. 56.1 Stmt. ¶ 50.) Plaintiff followed up with DOC'S EEO Office to inquire about the status of her complaint, but the office informed her that they had no record of her complaint against Breeland. (*See* Pl. Dep. 109:20-21, 110:5-11.) Plaintiff then faxed DOC'S EEO Office another copy. (*See id.* at 110:9-10.) DOC listed the complaint as filed on January 17, 2006 and assigned an EEO investigator on January 25, 2006. (*See* Def. 56.1 Stmt. ¶¶ 52, 53; Pl. Aff., Ex. 12, Complaint of Discrimination, IEEO 000140.) After an investigation, on March 28, 2006 the DOC'S EEO Office found plaintiff's allegations against Breeland to have been "unsubstantiated." (*See* Def. 56.1 Stmt. ¶ 54; Pl. Aff., Ex. 12, Complaint of Discrimination, IEEO 000140; Pl. Aff. ¶ 47.)

Plaintiff filed a complaint against Dr. Lisa Rosenberg, an OB/GYN doctor at HMD, with the DOC'S EEO Office on October 12, 2005. (*See* Def. 56.1 Stmt. ¶ 51; Pl. Aff. ¶ 44; Pl. Aff., Ex. 5, Complaint of Discrimination (Addendum); Zinaman Declaration, Ex. G, Complaint of Discrimination (stamped October 10 and stamped received October 12, 2005).) The complaint claims that Dr. Rosenberg discriminated against plaintiff by failing to adhere to DOC policies regarding pregnant women and based on statements made by Dr. Rosenberg to plaintiff shortly after her July 2005 miscarriage. (*See id.*) Plaintiff alleges

that she never received any information or notification regarding a determination of her case against Dr. Rosenberg. (*See* Pl. Aff. ¶ 45.) Defendants sent a letter to plaintiff, dated March 21, 2007, advising that the DOC'S EEO OFFICE investigation in that case had been suspended due to plaintiff's filing of an external complaint with the U.S. Equal Employment Opportunity Commission. (*See* Zinaman Declaration, Ex. J, Letter of Determination-Correction Officer Ennette Guzman v. Dr. Lisa Rosenberg CASE NO. 20050142; Def. 56.1 Stmt. ¶ 55.)

## PROCEDURAL HISTORY

Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about March 21, 2006,[8] charging discrimination on the basis of disability. (*See* Def. 56.1 Stmt. ¶ 103; Zinaman Declaration, Ex. U, Charge of Discrimination, EEOC 000008.) Plaintiff alleges DOC was notified of her EEOC complaint on May 10, 2006. (*See* Pl. Aff. ¶ 54; Pl. Aff., Ex. 17, EEOC 000023, Notice of Charge of Discrimination.) The EEOC issued a "Dismissal and Notice of Rights" on August 25, 2006, stating that EEOC was closing its file on plaintiff's charges because her allegations

---

[8] Plaintiff states in her affidavit that the EEOC complaint was filed on March 16, 2006. (*See* Pl. Aff. ¶ 54.) Defendants, however, allege that the complaint was filed on March 21, 2006 (*see* Def. 56.1 Stmt. ¶ 103), a fact which plaintiff admits as undisputed in her response to defendants' 56.1 statement (*see* Pl. Aff. ¶ 103.) The evidence presented to the court shows that plaintiff's EEOC complaint was stamped on March 21, 2006. (*See* Zinaman Declaration, Ex. U, EEOC Complaint, EEOC 000008.) This slight discrepancy in the date is not material to the outcome of this motion.

did not involve a disability under the Americans with Disabilities Act, and notifying plaintiff of her right to bring suit within 90 days of that notice.  (*See* Def. 56.1 Stmt. ¶ 103; Zinaman Declaration, Ex. U, Dismissal and Notice of Rights, EEOC 000004.)

After receiving the notice of her right to sue, on October 23, 2006, plaintiff, appearing *pro se*, began this civil action in federal court by filing a complaint alleging employment discrimination based on disability, in violation of the Americans with Disabilities Act of 1990.  (*See* ECF No. 1, Complaint; Def. 56.1 Stmt. ¶ 105.)  Plaintiff subsequently retained counsel, the Egan Law Firm.  (*See* ECF No. 6, Notice of Appearance.)  Plaintiff then filed an amended complaint on January 31, 2007, alleging employment discrimination in violation of Title VII and state law.  (*See* ECF No. 9, Amended Complaint; Def. 56.1 Stmt. ¶ 106.)

Because plaintiff had raised only a disability claim in her original complaint with the EEOC, plaintiff amended her EEOC complaint on August 22, 2007 to add sex and pregnancy discrimination, as well as retaliation claims.  (*See* Def. 56.1 Stmt. ¶ 104; Zinaman Declaration, Ex. V, Amendment to Charge No.: 520-2006-00598.)  The EEOC issued a "Notice of Right to Sue Within 90 Days" on February 21, 2008.  (*Id.*)  Plaintiff then served a second amended complaint on defendants on April 3, 2008

(*see* ECF No. 31, Affidavit of Service for Second Amended Complaint.), which was filed with the court on September 9, 2008.  (*See* Second Am. Compl.; Def. 56.1 Stmt. ¶ 107.)

**DISCUSSION**

**A. Summary Judgment Standard**

The court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law."  *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation and internal quotation marks omitted).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (citation and internal quotation marks omitted).  Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001). Nevertheless, the nonmoving party may not rest "merely on allegations or denials" but must instead "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture [are] insufficient to preclude the granting of the motion."). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

"Employment discrimination cases raise special issues on summary judgment." *Kenney v. New York City Dep't of Educ.*, No. 06-CV-5770, 2007 WL 3084876, at *3 (S.D.N.Y. Oct. 22, 2007). Specifically, employment discrimination cases that involve a dispute concerning the "employer's intent and motivation," may

not be suitable for summary judgment. *Id.* (citation and internal quotation marks omitted); *see Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The Second Circuit has noted, however, that "we went out of our way to remind district courts that the impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation and internal quotation marks omitted); *see also Holcomb*, 521 F.3d at 137 ("Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."). The moving party, in this case the employer, "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994).

**B. Title VII and NYSHRL Gender and Pregnancy Discrimination**

Plaintiff alleges that defendants discriminated against her based on her gender and pregnancy in violation of Title VII and NYSHRL. Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII was amended by the Pregnancy Discrimination Act, which provides that "women affected by pregnancy,

childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).

Plaintiff's federal and state claims of sex and pregnancy discrimination are analyzed under the three-step burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *Kerzer*, 156 F.3d 396. Discrimination claims under NYSHRL are analytically identical and apply the same burden-shifting framework as Title VII claims. *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010); *Salomon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) ("We typically treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims.").

Initially, the plaintiff bears the burden of establishing a *prima facie* case of discrimination. To establish a *prima facie* case, the plaintiff must show that (1) she is a member of a protected class, (2) she applied for a position for which she was qualified or she satisfactorily performed the duties required by the position, (3) she suffered an adverse employment action, and (4) such adverse employment action occurred under circumstances giving rise to an inference of

discrimination. *McDonnell Douglas*, 411 U.S. at 802. The Second Circuit has "characterized this burden as '*de minimis*:' it is 'neither onerous, nor intended to be rigid, mechanized or ritualistic.'" *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001)); *see also Burdine*, 450 U.S. at 253 ("The burden of establishing a prima facie case . . . is not onerous.").

If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the alleged adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. The employer's "burden is one of production, not persuasion" and involves "'no credibility assessment'" of the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Marty's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)); *Pathare v. Klein*, No. 06-CV-2202, 2008 WL 4210471, at *4 (S.D.N.Y. Sept. 12, 2008). At this stage, the employer "must present a clear explanation for the action." *Pathare*, 2008 WL 4210471, at *4; *Mandell v. County of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003) ("An employer's explanation of its legitimate nondiscriminatory reasons must be 'clear and specific.'" (quoting *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985)).

If the employer meets its burden, the plaintiff then must present evidence to show that the employer's reason is a mere pretext for an impermissible discriminatory motive. *McDonnell Douglas*, 411 U.S. at 804; *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006). In the summary judgment context, this means the plaintiff must "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for [its decision] is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo*, 22 F.3d at 1225.

Here, plaintiff alleges that defendants discriminated against her based on gender and pregnancy by assigning female correction officers to less favorable tours, facilities, and posts, denying her a steady tour when she became pregnant, reassigning her to Control II on July 8, 2005, denying her applications for a transfer and steady posts, and refusing to remove her firearm restriction. As there is no dispute regarding the first element of the *McDonnell Douglas* analysis — that plaintiff is a member of a protected class because she is a woman and was pregnant or on pregnancy-related leave at the time of the alleged discriminatory acts – the court considers the remaining elements.

### 1. Gender Discrimination Regarding Preferred Tours, Facilities, and Posts

Plaintiff claims that DOC discriminated against female correction officers by assigning them to less preferential tours, facilities, and posts than comparably situated male correction officers. (*See* Second Am. Compl. at 6-7). Specifically, plaintiff alleges that female correction officers are kept "on the wheel," meaning they are assigned to random work shifts rather than being on a steady tour, for longer than male correction officers. (*See id.* at 7.) Plaintiff further claims that RNDC, which is "widely regarded as a difficult post" because it "houses adolescent offenders who tend to be more violent and less compliant than older inmates," is disproportionately staffed with female correction officers. (*See id.* at 6-7.) Finally, plaintiff claims that male correction officers at RNDC are assigned to "preferred" posts, which require less inmate contact, more often than female correction officers. (*See id.* at 7.) For example, plaintiff testified during her deposition that female correction officers are usually assigned to "high classification" housing areas within RNDC, where the most difficult inmates are housed. (*See* Pl. Dep. 144:3-18, 146:10-13.)

### i. Tour Assignments

Defendants argue that plaintiff's gender discrimination claim regarding the assignment of steady tours must be dismissed because plaintiff never requested to be assigned a steady tour. (*See* ECF No. 68-1, Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def. Mem.") at 14.) While defendants do not specifically frame their challenge in terms of plaintiff's *prima facie* burden, in essence defendants argue that plaintiff has not satisfied the second element of her *prima facie* case as set out in *McDonnell Douglas*, i.e. that she applied for a position for which she was qualified. *See McDonnell Douglas*, 411 U.S. at 802. The Second Circuit has found that "the second element of a *prima facie* case cannot be established merely with evidence that a plaintiff generally requested promotion consideration. A specific application is required . . . ." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 227 (2d Cir. 2004). Plaintiffs are required to allege specific applications to a position in order "to 'ensure[] that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer.' Further, the requirement ensures that the fact finder is not left to speculate as to the qualifications of the competing candidates, the damages to be derived from the salary of unknown jobs, the

availability of alternative positions, the plaintiff's willingness to serve in them (e.g., in other locales or on other shifts), etc. The requirement also protects employers from the unfair burden of having 'to keep track of all employees who have generally expressed an interest in promotion and [to] consider each of them for any opening for which they are qualified but did not specifically apply.'" *Id.* (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1999)).

The specific application requirement is not limited to claims alleging a discriminatory failure to promote. Other courts in this circuit have applied the same requirement in cases alleging a discriminatory failure to transfer. *See, e.g.*, *Wright v. Goldman, Sachs & Co.*, 387 F. Supp. 2d 314, 323-24 (S.D.N.Y. 2005) (finding that a specific application for a transfer is required in failure-to-transfer claim); *see also McDonald v. Gonzales*, No. 05-CV-55, 2007 WL 951445, at *8 (N.D.N.Y. Mar. 27, 2007) (same).

The court can find no reason why the specific application requirement should not apply in the context of a failure to grant a steady tour. The reasoning articulated in *Petrosino* applies with equal force in this context. First, requiring a plaintiff to show that she or he applied for a steady tour would ensure that plaintiff alleges a specific adverse action and instance of discrimination by an employer.

*See Petrosino*, 385 F.3d at 227.  Second, the court is not left

to speculate as to the qualifications of other candidates

applying for the same tour, the availability of and demand for

specific tours, and the willingness of plaintiff to work a

particular tour.  *See id.*  Finally, without this requirement,

employers would be unduly burdened in having to keep track of

every employee who generally expressed an interest in working a

steady tour, even if they did not specifically apply for a

particular steady tour.  *See id.*  For these reasons, the court

finds that plaintiff must show that she applied for, and was

denied, a steady tour in order to satisfy the second element of

her *prima facie* case of gender-based discriminatory treatment in

the assignment of steady tours.[9]

---

[9] Plaintiff is unclear as to the theory upon which she relies for her claims
of disparate treatment in the assignment of facilities, posts, and tours.
*See Victory v. Hewlett-Packard Co.*, 34 F. Supp. 2d 809, 818 (E.D.N.Y. 1999)
("There are various theories upon which a claim of employment discrimination
may be advanced, including pretext, mixed motive and a pattern or practice of
discrimination.").  It is unclear whether plaintiff would be able to maintain
a pattern-or-practice claim of discrimination, because she brings this action
as a private individual and not as representative of a group of employees.
*See Ghent v. Moore*, 519 F. Supp. 2d 328, 332 n.2 (W.D.N.Y. 2007) (stating
that "[i]t is unclear in this circuit whether an individual plaintiff may
proceed on a pattern-or-practice theory" and collecting cases); *McManamon v.
City of New York Dep't of Corr.*, No. 07-CV-10575, 2009 WL 2972633, at *5 n.3
(S.D.N.Y. Sept. 16, 2009) (collecting cases).  However, the court need not
decide this issue at this stage.  The requirement that plaintiff show that
she applied for a specific position in order to satisfy the second element of
the *prima facie* case applies to both individual and pattern-or-practice
disparate treatment cases.  *See Petrosino*, 385 F.3d at 207 (applying specific
application requirement to individual discrimination case); *Ghent*, 519 F.
Supp. 2d at 332 n.3 (noting that in pattern-and-practice claim for failure to
promote, plaintiff must allege that he applied for specific position).  As
the court dismisses plaintiff's tour assignment claim for failure to show
that she applied for and was denied a steady tour, it is not necessary to
decide whether the claim is an individual or pattern-or-practice disparate
treatment claim.  Further, the court need not decide this issue with regard

Plaintiff fails to satisfy this burden. Plaintiff testified that she never asked to be assigned a steady tour. (*See* Pl. Dep. 37:16-18, 49:16-21.) Plaintiff does proffer evidence that on one occasion, on July 7, 2005, she contacted the personnel office and unsuccessfully attempted to contact Nurse Rhaney from HMD to request a steady tour once she became pregnant. (*See* Pl. Aff. ¶¶ 8-9; Pl. Dep. 48:14-49:15.) It appears that this evidence relates specifically to plaintiff's pregnancy discrimination claim with regard to defendants' failure to award plaintiff a steady tour when she became pregnant, rather than to plaintiff's gender-based discrimination claim. But even assuming that plaintiff presents this one unsuccessful attempt to reach DOC by telephone as evidence to support her gender-based claim of disparate treatment in the assignment of steady tours, plaintiff would still fail to satisfy the second element of her *prima facie* case. This one unsuccessful attempt to contact the appropriate DOC officer by telephone to request a steady tour does not satisfy the requirement that plaintiff actually apply for and be denied such position. *See Petrosino*, 385 F.3d at 227. Plaintiff's single unsuccessful attempt to request a steady tour falls short of

to the facility and post assignments claims because defendants fail to challenge these claims on their motion for summary judgment. Thus, whether plaintiff brings individual or pattern-or-practice disparate treatment claims, and whether plaintiff can maintain the latter as a private individual, is not decided at this time.

even the informal requests for consideration for a position rejected by the Second Circuit in *Petrosino*. *See id.* Because plaintiff, at most, merely *attempted* to rather than *actually* made a request for a steady tour, she has failed to establish a *prima facie* case of gender discrimination with regard to tour assignments. Accordingly, defendants' motion for summary judgment on this claim is granted.

### ii. Preferred Facilities and Posts

Defendants fail to satisfy their initial burden as movants under Fed. R. Civ. P. 56 to show the absence of any genuine issue of material fact with regard to plaintiff's claim of gender discrimination in the assignment of facilities and posts. *See Celotex Corp.*, 477 U.S. at 323 (stating that movants have the initial burden of showing no genuine issue of material fact for trial). Even though defendants identify these claims in their submissions to the court (*see, e.g.*, Def. Mem. at 14; Def. 56.1 Stmt. ¶¶ 3, 84), they fail to address the absence of a genuine issue of material fact or argue why summary judgment is warranted for these claims. While it is possible for a moving party to obtain summary judgment by merely showing that "little or no evidence may be found in support of the nonmoving party's case," *see Gallo*, 22 F.3d at 1223-24, in this case defendants have failed to present any factual or legal bases to grant summary judgment on plaintiff's gender-based claims regarding

the assignment of facilities and posts.  For example, defendants did not present any evidence relating to assignment by gender to "preferred" facilities and posts.  Because defendants did not meet their burden under Fed. R. Civ. P. 56, summary judgment on plaintiff's claims of gender discrimination in the assignment of facilities and posts is denied.

## 2. Failure to Assign a Steady Tour Once Plaintiff Became Pregnant

Plaintiff claims that DOC discriminated against her based on her pregnancy when it failed to assign her a steady tour upon learning that she was pregnant.  (*See* Second Am. Compl. at 9; Pl. Mem. at 1.)  Defendants argue that this claim should be dismissed because plaintiff did not suffer an adverse employment action when DOC failed to automatically award a steady tour.  (*See* Def. Mem. at 7-8.)  Defendants also argue that there is no evidence supporting an inference of discrimination.  (*See id.* at 10-11.)

Based on the evidence presented by the parties, the court agrees that plaintiff has failed to present sufficient evidence to raise a genuine issue of material fact that could support a finding that she suffered an adverse employment action when she was not assigned a steady tour once she became pregnant.  The third *McDonnell Douglas* element requires a showing of an adverse employment action.  *See McDonnell Douglas*,

411 U.S. at 802.  An adverse employment action is defined as "a materially adverse change in the terms and conditions of employment."  *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citation and internal quotation marks omitted).  "Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Williams v. R.H. Donnelly, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (citation and internal quotation marks omitted).  The plaintiff must show that the alleged adverse action was "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Sanders*, 361 F.3d at 755 (citation and internal quotation marks omitted); *Williams*, 368 F.3d at 128.

Here, plaintiff asserts, without proffering supporting documentation, that it is DOC policy to assign all pregnant women a steady tour.  (*See* Pl. Aff. ¶ 7; Pl. Dep. 49:21-50:2, 66:13-17.)  However, it appears from the record that this alleged policy, if it exists, is unofficial and unwritten.  The testimony of Nurse Rhaney, the HMD nurse in charge of pregnant officers, supports plaintiff's assertion.  (*See* Zinaman Declaration, Ex. C, Rhaney Deposition Transcript ("Rhaney Dep.")

16:5-7.)  Nurse Rhaney confirmed that "all pregnant women are
supposed to have steady tours."  (*Id.*)  Despite this alleged
policy, plaintiff was "on the wheel" instead of assigned to a
steady tour when she returned to work in July of 2005.  (*See* Pl.
Aff. ¶ 6; *see also* Pl. Dep. 48:10-18.)  As a result, on July 7,
2005, plaintiff was reassigned from the 7-3 tour to the midnight
tour.  (*See* Pl. Aff. ¶ 8; Pl. Dep. 48:10-16.)  Plaintiff claims
that failing to assign her a steady tour, which resulted in her
assignment to the midnight tour, was an adverse employment
action because "[p]regnant women need more sleep than those who
are not pregnant."  (Pl. Mem. at 11 n.3.)

        Failing to automatically assign plaintiff a steady
tour does not amount to a "materially adverse change" in the
terms and conditions of her employment.  *See Sanders*, 361 F.3d
at 755 (citation and internal quotation marks omitted).  The
assignment of unfavorable tour hours, without more, does not
constitute an adverse employment action for purposes of Title
VII.  *See Johnson v. Eastchester Union Free School Dist.*, 211 F.
Supp. 2d 514, 518 (S.D.N.Y. 2002) (holding that having to work
"very inconvenien[t]" hours does not amount to a materially
adverse employment action); *see also Braithwaite v. Kingsboro
Psychiatric Center*, No. 07-CV-0127, 2009 WL 2596486, at *6
(E.D.N.Y. Aug. 21, 2009) (finding that "denial of the shift
transfer requests did not constitute an adverse action for the

purposes of Title VII"). Plaintiff merely claims that the assignment to the midnight tour was adverse because she required more sleep as a pregnant woman, and does not claim that this assignment affected her ability to perform her work or otherwise changed the terms and conditions of her employment. The court finds that plaintiff has failed to show that DOC's failure to assign a steady tour automatically upon becoming aware of plaintiff's pregnancy was "more disruptive than a mere inconvenience." *Sanders*, 361 F.3d at 755 (citation and internal quotation marks omitted). Accordingly, plaintiff has failed to establish a *prima facie* case of pregnancy discrimination. Defendants' motion for summary judgment on plaintiff's pregnancy discrimination claim with regard to the failure to assign a steady tour once she became pregnant is therefore granted.

Even assuming, *arguendo*, that the failure to assign a steady tour constitutes a materially adverse employment action, plaintiff has not established that this action occurred under circumstances giving rise to an inference of discrimination. Although Nurse Rhaney confirms plaintiff's assertion that DOC policy requires that all pregnant women be assigned a steady tour (*see* Pl. Aff. ¶ 7; Pl. Dep. 49:21-50:2, 66:13-17; *see* Rhaney Dep. 16:5-7), plaintiff testified that she was not assigned a steady tour because HMD "never wrote it down on [her] disposition paper." (*See* Pl. Dep. 50:2-3.) After she was

assigned the midnight tour on July 7, 2005, plaintiff allegedly tried to rectify this oversight by attempting to contact Nurse Rhaney at HMD, but was unable to reach her that day. (*See* Pl. Aff. ¶¶ 8-9; Pl. Dep. 48:14-15, 49:1-4.) Plaintiff offers no other evidence to support her claim that she was discriminatorily not assigned a steady tour once she became pregnant.

While it is true that plaintiff's burden at this stage is *de minimis*, she must still offer some admissible evidence that could support an inference of discrimination. "Conclusory allegations, conjecture, and speculation . . . are insufficient . . . ." *Kerzer*, 156 F.3d at 400. Plaintiff fails to satisfy her burden. She offers nothing more than her own conclusory allegation that HMD's failure to assign her a steady tour was discrimination based on her pregnancy. Therefore, defendant's motion for summary judgment on plaintiff's claim of pregnancy discrimination with regard to the failure to assign a steady tour once defendants became aware of plaintiff's pregnancy is granted on this ground.[10]

---

[10] Further, the fact that plaintiff claims that she was denied a benefit normally granted to other pregnant correction officers at DOC militates against a finding of any pregnancy discrimination, as prohibited by the Pregnancy Discrimination Act. Title VII, as amended by the Pregnancy Discrimination Act, requires that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as *other persons not so affected* but similar in their ability or inability to work." 42 U.S.C. § 2000e(k) (emphasis added). Here, by arguing that she was treated less favorably than other pregnant officers, plaintiff is comparing herself to other pregnant employees, not to non-

### 3. Reassignment to Control II on July 8, 2005

Plaintiff claims that Breeland discriminated against her based on her pregnancy when she reassigned plaintiff to work the Control II post on July 8, 2005. (*See* Second Am. Compl. at 9; Pl. Mem. at 2.) Defendants argue that this claim should be dismissed because plaintiff did not suffer an adverse employment action when she was asked to report to Control II. (*See* Def. Mem. at 4-7.) Defendants also argue that plaintiff has not alleged enough admissible facts to raise an inference of discrimination, or to rebut the proffered legitimate non-discriminatory reason for the reassignment. (*See id.* at 8-13.)

Based on the evidence submitted by the parties, the court finds that plaintiff has presented sufficient admissible evidence to raise an inference that her reassignment to Control II was discriminatory. According to plaintiff, Breeland was aware that plaintiff was pregnant at the time she ordered the reassignment to Control II because she had seen plaintiff, who was visibly pregnant and wearing maternity clothes, prior to

---

pregnant employees. Thus plaintiff's claims do not allege pregnancy discrimination as defined by the Act. *See, e.g.*, *EEOC v. Detroit-Macomb Hosp. Corp.*, Nos. 91-CV-1088, 91-CV-1278, 1992 WL 6099, at *3 (6th Cir. Jan. 27, 1992) ("Showing that different pregnant workers are treated differently does not supply the *prima facie* case that the EEOC must develop in order to prevent summary judgment from being granted."); *Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d 1280, 1309 (N.D. Ga. 2009) (finding that allegations that plaintiff was treated differently than other pregnant women "have no bearing on [plaintiff's] ability to prove discrimination under the [Pregnancy Discrimination Act] since these allegations only show that she was treated differently than other pregnant women").

roll call.  (*See* Pl. Aff. ¶ 10; Pl. Dep. 50:20-23, 52:15-16,

53:12-16, 54:6-55:18.)  Although Breeland testified that she did

not recall seeing plaintiff on July 8, 2005 (*see* Breeland Dep.

33:12-13, 23), Breeland further testified that she was aware

that plaintiff was pregnant, but was unsure whether she learned

this information before or after she ordered plaintiff

reassigned to the Control II post.  (*See id.* 24:12-20.)

Plaintiff alleges that Breeland referred to her as the "pregnant

officer" when she requested Captain Rivera to reassign

plaintiff.[11]  (*See* Pl. Aff. ¶ 11; Pl. Dep. 52:16-18.)  Breeland,

on the other hand, testified that she asked for "the MMR person"

to be sent to Control II.  (*See* Breeland Dep. 25:13-14, 42:5-8.)

Plaintiff also alleges that Breeland insisted on sending her to

Control II, even after Captain Rivera explained that Control II

was not appropriate for pregnant women such as plaintiff.  (*See*

Pl. Aff. ¶ 13; Pl. Dep. 57:15-24, 58:17-19; Zinaman Declaration,

Ex. I, DOC'S EEO Office Final Determination ("DOC EEO Final

Determination", IEEO 000143.)  Captain Rivera confirmed this

---

[11] Defendants argue that the allegation that Captain Rivera told plaintiff
that Breeland had asked that the "pregnant officer" be sent to Control II is
hearsay, and therefore inadmissible.  However, these out-of-court statements
by Captain Rivera and Breeland are not hearsay under Fed. R. Evid.
801(d)(2)(D), because they are offered by plaintiff against a party and are
statements by the party's agents "concerning a matter within the scope of the
. . . employment, made during the existence of the relationship."  Fed. R.
Evid. 801(d)(2)(D).  Both Captain Rivera and Breeland are DOC employees, and
their statements, offered by plaintiff against the defendants, were made
during their employment with DOC and concern a matter within the scope of
their employment, i.e. post assignments for correction officers.  Therefore,
the statements are admissible as non-hearsay under Rule 801(d)(2)(D).

fact during his interview with DOC'S EEO Office, and his
statements as reported by the EEO investigator are not hearsay
under Fed. R. Evid. 801(d)(2)(C) and (D).  (*See* DOC EEO Final
Determination, IEEO 000143.)  Breeland, however, did not recall
Captain Rivera informing her of any restrictions in assigning
plaintiff to Control II.  (*See* Breeland Dep. 49:17-22.)
Breeland testified that she reassigned plaintiff to Control II,
an MMR III post, in order to relieve another officer on overtime
working a non-MMR III post.  (*See* Breeland Dep. 42:5-18, 43:8-
10.)  Plaintiff testified at her deposition that she believed
Breeland was trying to save money on overtime by assigning her
to Control II and had no reason to believe that Breeland was not
acting to save on overtime.  (*See* Def. 56.1 Stmt. ¶ 39; Pl. Dep.
59:19-60:9.)  However, plaintiff contends that other officers
were available to relieve either the Control II officer or the
overtime officer, thus making the reassignment of plaintiff to
Control II unnecessary.  (*See* Pl. Aff. ¶¶ 17-18.)  Breeland
conceded that other officers could have been sent to Control II
to relieve overtime, if available.  (*See* Breeland Dep. 46:12-
25.)

Construing these facts in the light most favorable to
the nonmoving party and resolving "all ambiguities and . . . all
reasonable inferences against the moving party," *Flanigan*, 242
F.3d at 83, the court finds that a reasonable jury could

conclude that Breeland discriminated against plaintiff based on her pregnancy when she ordered the reassignment to Control II. The jury could credit plaintiff's testimony and find that Breeland ordered that the "pregnant officer" be reassigned to Control II, after learning that this post was not appropriate for pregnant officers, and targeted only the "pregnant officer" even though other officers were available to take the Control II and overtime posts. Plaintiff presented sufficient evidence to raise a material issue of fact to raise an inference of discrimination under the fourth element of the *prima facie* case.

Nonetheless, plaintiff's pregnancy discrimination claim fails because, as defendants point out, she has not presented sufficient evidence to show that she suffered an adverse employment action. As stated above, the second *McDonnell Douglas* element requires that plaintiff show that the reassignment to Control II was "a materially adverse change" in the terms and conditions of her employment. *See Sanders*, 361 F.3d at 755 (citation and internal quotation marks omitted). Plaintiff claims that the Control II reassignment was materially adverse because the post lacks air conditioning and an adjacent bathroom, necessary accommodations for a pregnant woman. (*See* Second Am. Compl. at 9; Pl. Mem. at 10-14.)

Plaintiff's showing is insufficient to establish that plaintiff suffered a materially adverse employment action. An

assignment to work at an inferior facility, without more, does not constitute an adverse employment action.  *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (finding that assignment to inferior facilities, which required plaintiff to rotate through classrooms, was not an adverse employment action).[12]  Moreover, "assigning the Plaintiff posts that she claimed to have been inappropriate in light of her health restrictions does not constitute an adverse employment action."  *Reckard v. County of Westchester*, 351 F. Supp. 2d 157, 161 (S.D.N.Y. 2004) (assigning plaintiff to work at non air-conditioned jails when plaintiff had health restriction requiring an air-conditioned environment did not constitute an adverse employment action); *see also Weisman v. New York City Dep't of Educ.*, No. 03-CV-9299, 2005 WL 1813030, at *7-*8 (S.D.N.Y. Aug. 1, 2005) (assigning plaintiff to "difficult working conditions," without a "diminution in benefits, title, or responsibilities," does not constitute adverse employment action).[13]  Plaintiff does not allege that the reassignment to Control II was accompanied by any change in the terms and conditions of her employment.  Indeed, after refusing to assume

---

[12] Even though *Galabya* was a case under the Age Discrimination in Employment Act ("ADEA"), it analyzed and applied the legal framework for Title VII discrimination cases.  *See Galabya*, 202 F.3d at 640 n.2.

[13] As in *Galabya*, *Weisman* is an ADEA case applying the Title VII burden-shifting framework.  *See Weisman*, 2005 WL 1813030, at *5.

the Control II post, plaintiff was not disciplined or otherwise sanctioned by DOC. *See Reckard*, 351 F. Supp. 2d at 161-62 (finding no adverse employment action when plaintiff was assigned to inappropriate post in light of health restrictions and "[p]laintiff [did] not claim that she lost any salary or benefits when she opted not to perform tasks she believed were inappropriate").

Because plaintiff does not present any evidence that the reassignment to Control II was accompanied by some adverse change in her conditions of employment, it does not constitute an adverse employment action. Notwithstanding the very sympathetic circumstances of plaintiff's tragic loss of her pregnancy the day after her reassignment to the Control II post, the reassignment does not constitute a legally cognizable adverse change in plaintiff's conditions of employment. Plaintiff thus has failed to establish a *prima facie* case of pregnancy discrimination. Accordingly, defendants' motion for summary judgment on the claim of pregnancy discrimination in the reassignment to Control II is granted.

### 4. Denial of Transfer and Steady Posts

Plaintiff claims that DOC discriminated against her on the basis of gender and pregnancy when they denied her applications for a transfer and steady posts. (*See* Second Am. Compl. at 7-8; Pl. Aff. ¶ 43.) Defendants argue that plaintiff

did not suffer an adverse employment action when she was denied these requests. (*See* Def. Mem. at 16-17.) Defendants also argue that there are no facts raising an inference of discrimination and that defendants had legitimate non-discriminatory reasons for the employment action. (*See id.* at 18-21.)[14]

### i. Denial of Transfer Request

Plaintiff claims that the denial of her request to transfer from RNDC in July of 2007 was discriminatory based on her pregnancy. Based on the evidence submitted by the parties, the court finds that plaintiff has presented enough facts to raise an inference that the denial of her transfer request constituted discrimination based on her pregnancy. Plaintiff submitted a "Request for Transfer" application in July of 2007, requesting a transfer from RNDC in Rikers Island to other DOC facilities. (*See* Pl. Aff., Ex. 10, Request for Transfer; Pl.

---

[14] Defendants further argue that plaintiff was not qualified for a steady post or a transfer because of her "chronic absent" designation. (*See* Def. Mem. at 15-16.) According to defendants, these positions are awarded on the basis of "seniority, work performance and attendance." (*See id.* at 15.) To support their assertion, defendants cite to DOC Operations Order 14/91, purportedly submitted as Exhibit W to the Zinaman Declaration. This document was never submitted. Thus, defendants have failed to present any admissible evidence establishing the purported criteria for granting applications for steady posts and transfers. Further, even if defendants had provided the DOC Operations Order into evidence, the factors outlined therein do not establish the qualifications needed to apply for steady posts or transfers, or show that plaintiff lacked the qualifications for these positions. Rather, the DOC Operations Order, as described by defendants, establishes factors that DOC will consider in granting such applications. This evidence is relevant in considering defendants' alleged legitimate non-discriminatory reasons for denying plaintiff's requests.

Aff. ¶ 38.)  DOC denied this transfer request after plaintiff's commanding officer indicated that the request was "not recommended" because "[a]ttendance should be better."  (*See id.*) Plaintiff had been designated "chronic absent" from May 15, 2006 to November 15, 2006.  (*See* Pl. Aff., Ex. 7, Chronic Absent Designations; Def. 56.1 Stmt. ¶ 93.)  This designation was extended for another six months from September 10, 2006 to March 10, 2007.  (*See id.*)  Defendants argue that plaintiff was denied the transfer request because of her record of absenteeism, for which she had been designated "chronic absent."  (*See* Def. Mem. at 20.)

Plaintiff argues, and the court agrees, that relying on the "chronic absent" designation in denying her request for a transfer constituted pregnancy discrimination because DOC, in violation of its own policy, improperly relied on her pregnancy-related absences.  (*See* Pl. Mem. at 16.)  The DOC Directive on Absence Control/Uniformed Sick Leave Policy states that "[a] member who reports sick on twelve (12) or more work days within a twelve (12) month period shall be classified as chronic absent."  (*See* Pl. Aff., Ex. 9, DOC Directive on Absence Control/Uniformed Sick Leave Policy ("DOC Directive"), at 2.) The DOC Directive explicitly provides that pregnancy-related absences are excluded from the calculation of use of sick leave as follows: "For the purpose of this Directive, the following

shall be excluded in the calculation of use of sick leave: . . .
C. absence related to pregnancy, subject to such limitations as
the Department imposes." (*See* DOC Directive, at 1; Pl. Aff. ¶
37.) Plaintiff's "Employee Personal Profile Information" record
shows that between July 11, 2005 and May 14, 2006 all but three
of plaintiff's recorded absences were "Code #17," meaning
pregnancy. (*See* Pl. Aff., Ex. 8, Employee Personal Profile
Information.) Defendants argue that plaintiff has offered no
evidence that her "chronic absent" designations were based on
her pregnancy-related absences because the records proffered by
plaintiff do not cover the entire period during which she was
designated "chronic absent." (*See* ECF No. 69, Defendants' Reply
Memorandum of Law in Further Support of Their Motion For Summary
Judgment, at 7 n.6.) Defendants do not, however, offer any
evidence of plaintiff's attendance record that would support the
propriety of the "chronic absent" designations.

Viewing this evidence in the light most favorable to
the nonmoving party and drawing all inferences in favor of the
plaintiff, *see Flanigan*, 242 F.3d at 83, the court finds that a
reasonable jury could conclude that defendants improperly relied
on plaintiff's pregnancy-related absences in designating her
"chronic absent" and thus discriminated against plaintiff on the
basis of her pregnancy when they denied her transfer request
based on poor attendance. Plaintiff's "Employee Personal

43

Profile Information" record suggests that at least the first "chronic absent" designation was based on her pregnancy-related absences. Because defendants fail to provide any contrary evidence, the ambiguity regarding the second designation must be resolved in plaintiff's favor. Thus, plaintiff has alleged enough facts to raise an inference of pregnancy discrimination in the denial of her request to transfer.

Nonetheless, plaintiff's claim fails because she has not presented sufficient facts to demonstrate that she suffered an adverse employment action. Denial of a transfer request can constitute an adverse employment action. The Second Circuit has found that "a transfer from a job with prestige and opportunity for professional growth to a job with less prestige and little opportunity for growth could constitute an adverse employment action, even though the employer considered the jobs equal in status." *Beyer v. County of Nassau*, 524 F.3d 160, 165 (2d Cir. 2008) (citing to *de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996)). Similarly, "[t]he *denial* of a transfer may constitute an adverse employment action at the *prima facie* step of discrimination analysis when, as here, a plaintiff adduces sufficient evidence to permit a reasonable factfinder to conclude that the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity,

training opportunity, job security, or some other objective indicator of desirability." *Id.* (emphasis in original).

Here, plaintiff has failed to show that the denial of her request to transfer from RNDC was materially adverse. Plaintiff alleges that RNDC is a dangerous facility because adolescents are "notoriously violent and disobedient inmates." (Pl. Aff. ¶ 38.) Not only does plaintiff fail to present evidence in support of her contention regarding the dangerousness of RNDC, plaintiff also offers no evidence that the transfers she sought were to facilities "materially more advantageous" in any way. While safety considerations might be sufficient to constitute "materially more advantageous" work conditions, there is no evidence to support a finding that the transfers plaintiff sought were, in fact, to safer facilities. In fact, in her "Request for Transfer" application, plaintiff indicated that the reason for the request was a "closer commute." (*See* Pl. Aff., Ex. 10, Request for Transfer.) Plaintiff provides only her conclusory allegation that the transfer would have represented a "material change in [her] working conditions." (Pl. Aff. ¶ 38.) But "[c]onclusory allegations . . . are insufficient to create a genuine issue of fact." *Kerzer*, 156 F.3d at 400.

Because plaintiff does not present any admissible evidence that the denial of her transfer request constituted an

adverse employment action, plaintiff has failed to establish a
*prima facie* case of pregnancy discrimination.  Accordingly,
defendants' motion for summary judgment on the claim of
pregnancy discrimination in the denial of the July 2007 transfer
request is granted.

### ii. Denial of Steady Posts

Plaintiff asserts that the denial of her requests for
the Mental Health Officer, Clinic, Bus Escort, Corridor 3 & 5,
and two Corridor Relief Posts constituted discrimination based
on her pregnancy, and that the denial of her request for the
North South Corridor Post constituted discrimination based on
her gender.  (*See* Pl. Aff. ¶¶ 40, 43.)  Defendants claim that
plaintiff only applied for three posts in 2007:  Mental Health
Officer and two Corridor Relief Posts.  (*See* Def. Mem. at 15.)

Based on the evidence submitted by the parties, the
court finds that plaintiff has satisfied her burden to establish
a *prima facie* case of pregnancy and gender discrimination for
the denial of some, but not all, of the steady posts.
Additionally, the court finds that defendants failed to meet
their burden to provide a legitimate non-discriminatory reason
for the denial of these steady posts.

## 1. Adverse Employment Action[15]

Plaintiff asserts that she applied for six different steady posts in 2007: the Mental Health Officer, Clinic, Bus Escort, North South Corridor, Corridor 3 & 5, and Corridor Relief. (*See* Pl. Aff. ¶ 40.) According to plaintiff, the posts she requested represented "much better duty" than the Housing Area Post, to which she was assigned. (*See* Pl. Aff. ¶ 40.) Rather than being "locked in" with a large number of inmates during her entire shift, and supervising many aspects of their daily routines, (Pl. Aff. ¶ 40; Pl. Dep. 33:4-12), plaintiff claims that the corridor posts, i.e. North South Corridor, Corridor 3 & 5, and Corridor Relief Posts, required only that plaintiff "watch[] someone else supervising inmates going from one jail locale to the next." (*See* Pl. Aff. ¶ 40; Pl. Dep. 32:17-22.) The Mental Health, Clinic, and Bus Escort Posts, which plaintiff considered "preferred" posts, "involved even less inmate contact than the corridors, sometimes as little as one or two inmates at a time," and thus involved less risk of violence or injury. (*See* Pl. Aff. ¶ 41; *see also* Pl. Dep. 34:5-18.)

---

[15] Even though defendants did not specifically mention all posts that plaintiff allegedly requested, the court assumes that defendants' argument that the denial of post requests did not constitute an adverse employment action applies to all post applications at issue.

Plaintiff was denied the Mental Health Officer Post, which was awarded to another officer on June 26, 2007. (*See* Pl. Aff., Ex. 11, Steady Posts Awards.) Plaintiff asserted that the Clinic and Bus Escort Posts were never awarded to any officer, but were instead filled with rotating officers or used for overtime. (*See* Pl. Aff. ¶ 42 n.3; Pl. Dep. 34:19-24.) Plaintiff was awarded one Corridor Relief Post on October 9, 2007. (*See* Zinaman Declaration, Ex. O, Steady Posts Awards, Ex. P, Awarding of Steady Post; Pl. Aff. ¶ 42.) Also on October 9, 2007, the Corridor 3 & 5 Post and an additional Corridor Relief Post were awarded. (*See* Pl. Aff., Ex. 11, Steady Posts Awards.) Finally, plaintiff alleges that the North South Corridor Post was awarded to Officer Gomez, a male officer with much less seniority than plaintiff at the time the post was awarded. (*See* Pl. Aff. ¶ 42 n.3, 43.)

Based on these facts, and viewing all the evidence in the light most favorable to plaintiff, the court finds that plaintiff has presented sufficient facts to permit a fact finder to conclude that the denial of the Mental Health Officer, Clinic and Bus Escort Posts were adverse employment actions. As was explained above, the "[t]he *denial* of a transfer may constitute an adverse employment action at the *prima facie* step of discrimination analysis when . . . a plaintiff adduces sufficient evidence to permit a reasonable factfinder to

conclude that the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability." *Beyer*, 524 F.3d at 165 (emphasis in original). Here, plaintiff has presented evidence from which a reasonable jury could conclude that the posts outside the Housing Area were "materially more advantageous" because they involved less risk of violence or injury. A jury could find that reducing inmate contact, sometimes to one or two inmates at a time, results in materially safer working conditions. Safe working conditions are an "objective indicator of desirability" of the posts outside the Housing Area sought by plaintiff. *Cf. Dauer v. Verizon Communications Inc.*, 613 F. Supp. 2d 446, 456 (S.D.N.Y. 2009) ("Where a refusal to provide equipment significantly interferes with or precludes job performance, or creates 'unreasonably dangerous' conditions, such conduct can constitute an adverse employment action."), *rev'd on other grounds*, *Pucino v. Verizon Wireless Commc'ns, Inc.*, -- F.3d --, No. 09-CV-1306, 2010 WL 3191433 (2d Cir. Aug. 13, 2010). Therefore, the court finds that plaintiff has satisfied her burden to present evidence from which a jury could find an adverse employment action in the denial of the Mental Health, Clinic, and Bus Escort Posts.

For the same reasons as stated above, the denial of
the North South Corridor Post would constitute an adverse
employment action, but only if the post was awarded before
October 9, 2007, when plaintiff received her Corridor Relief
Post.  Plaintiff claims that the North South Corridor Post was
awarded to Officer Gomez, a male officer with much less
seniority than plaintiff.  (*See* Pl. Aff. ¶¶ 42 n.3, 43.)
Plaintiff does not specify when the post was awarded.
Defendants fail to provide any evidence regarding this post
award.  If the North South Corridor Post was awarded to Officer
Gomez before October 9, 2007, at a time when plaintiff was still
assigned the Housing Area Post, then the analysis above for the
Mental Health Officer, Clinic, and Bus Escort Posts applies
equally for determining that a jury could find that denial of
the North South Corridor Post constituted a materially adverse
employment action.  But, if the North South Corridor Post was
awarded on or after October 9, 2007, then plaintiff would fail
to establish this element.  On or after October 9, 2007,
plaintiff was assigned to the Corridor Relief Post, and there
are no facts to suggest that the North South Corridor Post is
"materially more advantageous" than her Corridor Relief Post.
Even if plaintiff had alleged that she was disappointed with her
assignment, "subjective, personal disappointments do not meet

the objective indicia of an adverse employment action." *Williams*, 368 F.3d at 128.

Because all ambiguities must be construed against the moving defendants, the court assumes, for purposes of this motion, that plaintiff is alleging that the North South Corridor Post was awarded before October 9, 2007. Accordingly, for the reasons stated above with regard to the Mental Health, Clinic, and Bus Escort Posts, plaintiff satisfies her burden of presenting sufficient evidence of a materially adverse employment action in the denial of the North South Corridor Post.

With respect to Corridor 3 & 5 and the additional Corridor Relief Posts, plaintiff fails to establish a *prima facie* case. It is undisputed that plaintiff was awarded one Corridor Relief Post on October 9, 2007. (*See* Zinaman Declaration, Ex. P, Awarding of Steady Post; Pl. Aff. ¶ 42.) The Corridor 3 & 5 and additional Corridor Relief Posts were also awarded on October 9, 2007. (*See* Pl. Aff., Ex. 11, Steady Post Awards.) Plaintiff has not offered any evidence to show that the Corridor 3 & 5 and additional Corridor Relief Posts were "materially more advantageous" than the Corridor Relief Post to which she was assigned. Further, as stated above, "subjective, personal disappointments do not meet the objective indicia of an adverse employment action." *Williams*, 368 F.3d at

128. Thus, plaintiff has failed to show that the denial of the Corridor 3 & 5 and additional Corridor Relief Posts constituted an adverse employment action. Accordingly, defendants' motion for summary judgment on plaintiff's claims of pregnancy discrimination in the denial of the Corridor 3 & 5 and additional Corridor Relief Posts is granted.

## 2. Inference of Discrimination

Plaintiff claims that the denial of the Mental Health, Clinic, and Bus Escort Posts constituted discrimination based on pregnancy. (*See* Pl. Aff. ¶ 43.) With respect to the Mental Health Officer Post, defendants concede that the "chronic absent" designation played a role in the determination to deny plaintiff this request. (*See* Def. Mem. at 20.) Given defendants' admission, the court finds that plaintiff has alleged enough facts to support an inference of pregnancy discrimination. The court's reasoning is outlined above in the discussion of plaintiff's transfer request. Accordingly, the court finds that plaintiff has established a *prima facie* case of pregnancy discrimination with respect to the Mental Health Officer Post denial.

With respect to the Clinic and Bus Escort Posts, plaintiff fails to offer sufficient evidence to raise an inference of pregnancy discrimination. Unlike the denial of the Mental Health Officer Post, defendants do not claim that the

denial of these posts was due to the "chronic absent"
designation.  Thus, plaintiff must present some other evidence
of discrimination in order to satisfy her burden.  Plaintiff
claims that the Bus Escort Post was never awarded to any
officer, but was instead used for overtime.  (*See* Pl. Aff. ¶ 42
n.3.)  Similarly, plaintiff claims that the Clinic Post was
never awarded to any officer.  (*See* Pl. Dep. 34:19-24.)
Instead, plaintiff asserts that the post was filled with
officers "that they like at the clinic" and who were trained to
fill the post.  (*See id.* at 35:2-6.)  These allegations are
insufficient to raise an inference of discrimination.  Plaintiff
has not presented any evidence to suggest that defendants denied
these post requests based on her pregnancy.  Nor does she
present any evidence to suggest that defendants relied on her
"chronic absent" designation, as they did with the Mental Health
Officer Post.  Because plaintiff offers no evidence to raise an
inference of discrimination, she has failed to establish a *prima
facie* case of discrimination.  Accordingly, defendants' motion
for summary judgment with regard to the Clinic and Bus Escort
Post denials is granted.

Plaintiff also claims that the denial of her request
for the North South Corridor Post constituted gender
discrimination.  (*See* Pl. Aff. ¶ 43.)  According to defendants,
post awards are determined on the basis of "seniority, work

performance and attendance." (*See* Def. Mem. at 15.)  Plaintiff
claims in her affidavit that Officer Gomez, the officer awarded
the North South Corridor Post, had much less seniority than
plaintiff at the time the post was awarded.  (*See* Pl. Aff. ¶¶ 42
n.3, 43.)  Further, plaintiff asserts that Officer Gomez was
still on probation at the time of the post award.  (*See id.*)
Defendants fail to address the North South Corridor Post award.
Based on this evidence, and viewing all facts in the light most
favorable to plaintiff, the court finds that plaintiff has
presented sufficient facts to raise an inference of gender
discrimination.  The facts are sufficient for a reasonable jury
to find that defendants discriminated against plaintiff on the
basis of her gender when they awarded a steady post to a
probationary male officer with less seniority and work
experience, two of the factors considered in determining post
awards, as alleged by defendants.  Therefore, plaintiff has
satisfied her burden to establish a *prima facie* case of gender
discrimination with respect to the denial of her request for the
North South Corridor Post.

### 3. Rebutting the Prima Facie Case

Because plaintiff established a *prima facie* case of
pregnancy and gender discrimination with respect to the Mental
Health Officer and North South Corridor Posts, defendants must

come forward with legitimate non-discriminatory reasons for the challenged employment actions.

Defendants argue that plaintiff was denied the Mental Health Officer Post because she was designated "chronic absent" and also because she was not the most senior officer to apply for the position. (*See* Def. Mem. at 20-21.) Seniority is a legitimate non-discriminatory criterion, and the evidence in the record shows that the officer awarded the Mental Health Officer Post was the most senior officer on the list of applicants. (*See* Pl. Aff., Ex. 11, Steady Post Awards.) Attendance can also be a legitimate non-discriminatory factor in employment determinations. In this case, however, plaintiff claims that defendants' attendance determination itself was discriminatory, and therefore defendants' reliance on plaintiff's attendance record to deny her steady posts was also discriminatory. Under Title VII, plaintiff does not need to show that the impermissible criterion, i.e. pregnancy, was the "but for" cause of the employment action. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 241-42 (1989). Rather, it is enough that she show that her pregnancy was a "motivating or substantial factor in the employment decision." *Kucharski v. CORT Furniture Rental*, 342 F. App'x 712, 713 (2d Cir. 2009) (citation and internal quotation marks omitted); *see also Price Waterhouse*, 490 U.S. at 241-42. Plaintiff presented undisputed evidence that her

pregnancy-related absences were improperly used to designate her "chronic absent." Defendants admit that they relied on the "chronic absent" designation as one basis to deny plaintiff the Mental Health Officer Post. Consequently, there is sufficient evidence to support a finding that pregnancy was a motivating factor in the employment decision to deny plaintiff's application for the Mental Health Officer Post.

With respect to the denial of the North South Corridor Post, defendants have failed to come forward with a legitimate non-discriminatory reason for awarding Officer Gomez, rather than plaintiff, this particular post. Accordingly, defendants' motion for summary judgment on the pregnancy and gender discrimination claims with respect to the denial of the Mental Health Officer and North South Corridor Posts is denied. However, the denial of the motion for summary judgment on the pregnancy discrimination claim with respect to the North South Corridor Post is without prejudice due to the insufficiency of facts establishing the element of a material adverse employment action, as discussed above.

### 5. Failure to Lift Firearm Restriction

Plaintiff claims that the failure to lift the firearm restriction from her ID was discriminatory. (*See* Second Am. Compl. at 10-11; Pl. Mem. at 2.) Although it is not entirely clear, plaintiff appears to claim that this action constituted

discrimination on the basis of her pregnancy.  (*See* Pl. Mem. at

16-17.)  Plaintiff testified that she considered the firearm

restriction to be discriminatory because it was based on her

depression, and her depression was due to her miscarriages.

(*See* Pl. Dep. 89:21-25.)  But plaintiff conceded that it was DOC

practice "to remove an officer's gun privileges when they become

depressed and anxious for any reason," and that she "was both

depressed and anxious following [her] second miscarriage."  (Pl.

Aff. ¶ 24.)  Thus any claim that the original "no firearm"

designation was discriminatory would fail because plaintiff

herself admits that defendants had a valid, non-discriminatory

reason to restrict her firearm privileges.

Plaintiff claims, however, that it was the failure to

lift the firearm restriction once she was cleared for full duty,

and not the original designation, that was discriminatory.

Plaintiff asserts that in February of 2005, when she was

returned to full duty, plaintiff asked Dr. Theo how she could

lift the firearm restriction from her ID.  (*See* Pl. Aff. ¶ 29.)

According to plaintiff, Dr. Theo "seemed not to know and

suggested that [she] talk to someone out front at HMD."  (*See*

*id.*)  A few months later, in May of 2006, plaintiff reported to

firearms training, an annual requirement for correction

officers.  (*See id.* at ¶ 30.)  Because of the firearm

restriction on her ID, plaintiff was turned away from training.

(*See id.*)  Plaintiff claims that when she reported back to her personnel office with this information, she was "wri[tten] up" by her administrative captain and sent away with no information on how she could lift that firearm restriction.  (*See id.*)  Plaintiff states that she then wrote to the warden at RNDC requesting that DOC lift the firearm restriction from her ID, but never received any response to this letter.  (*See id.* at ¶¶ 31-32.)

Nothing in these facts suggests that the failure to provide plaintiff with the information necessary to lift the firearm restriction – which is ultimately what plaintiff is alleging – occurred under circumstances giving rise to an inference of pregnancy or gender discrimination.  Nor does plaintiff present any facts to suggest that she suffered an adverse employment action.  Plaintiff concedes that she was able to obtain the necessary information from other sources.  (*See* Pl. Aff. ¶¶ 28, 32; Pl. Dep. 101:18-23.)  Defendants neither prevented plaintiff from requesting that the firearm restriction be lifted, nor denied her firearm privileges once she complied with the necessary requirements.  Failure to provide plaintiff with information, without more, does not materially affect the terms and conditions of her employment.

Because plaintiff has not presented sufficient evidence to show a materially adverse employment action or raise

an inference of discrimination, she fails to establish a *prima facie* case of discrimination for her firearm restriction claim. Accordingly, defendants' motion for summary judgment on the claim of discrimination in the failure to lift the firearm restriction is granted.

## C. Title VII and NYSHRL Retaliation Claims

Plaintiff alleges that defendants retaliated against her after she filed complaints of discrimination against several DOC employees, in violation of Title VII and NYSHRL. Title VII makes it

> an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). A plaintiff's retaliation claim is examined applying the same *McDonnell Douglas* burden-shifting framework utilized for disparate treatment claims. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). Retaliation claims under the NYSHRL, like hostile work environment claims, are governed by the same standards as federal claims under Title VII. *See Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) (stating that "retaliation claims under

the NYSHRL are generally governed by the same standards as federal claims under Title VII").

A plaintiff makes a *prima facie* showing of retaliation by establishing (1) participation in a protected activity known to the defendant, (2) an employment action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse employment action. *Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 123 (2d Cir. 2008). Only a "minimal" and "*de minimis*" showing is necessary to establish a *prima facie* retaliation claim at the summary judgment stage. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* discrimination case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence. *See Gallo*, 22 F.3d at 1225. Once a plaintiff has satisfied her *prima facie* burden, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for its action. *See Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004). The burden then shifts back to plaintiff to demonstrate that the reasons proffered by defendant were a pretext for retaliatory animus based upon protected Title VII activity. *See Jute*, 420 F.3d at 173, 180; *EEOC v. Thomas Dodge Corp.*, No. 07-

CV-988, 2009 U.S. Dist. LEXIS 24838, at *38 (E.D.N.Y. Mar. 25, 2009).

There is no dispute that plaintiff's complaints to DOC's EEO Office in October of 2005 and to EEOC in March of 2006 satisfy the first requirement that plaintiff participate in a protected activity known to the defendant. There is also no dispute that, for the purposes of defendants' instant motion, plaintiff's complaints to DOC's EEO Office and to EEOC constitute protected activity under Title VII because, viewing the evidence in the light most favorable to plaintiff, it appears that plaintiff had a "good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII" when she lodged complaints regarding the purported discrimination. *See Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (holding that, "[t]o prove that he engaged in protected activity, the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII," but only that he held a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law"); *see also Reed v. A. W. Lawrence & Co.*, 95 F.3d 1170, 1178-80 (2d Cir. 1996) (finding that the plaintiff's internal complaints regarding co-workers' offensive comments satisfied the first prong of the *prima facie*

analysis); *Galimore v. City Univ. of New York*, 641 F. Supp. 2d 269, 287 (S.D.N.Y. 2009) (same).

Plaintiff claims that following her complaints to DOC's EEO Office in October 2005 and to EEOC in March 2006, she was retaliated against in two ways.[16]  First, plaintiff claims that she was retaliated against when DOC failed to provide her with information on how to lift the firearm restriction from her ID, starting in February 2005, when she asked Dr. Theo how to lift the firearm restriction.  (*See* Second Am. Compl. at 10-11; Pl. Mem. at 17-21.)  Plaintiff's factual allegations with regard to this claim are summarized above in section B.5.  Given that, according to plaintiff, the firearm restriction was imposed before plaintiff filed her October 2005 complaints of discrimination with DOC's EEO Office (*see* Pl. Aff. ¶ 23 (stating that firearm restriction was imposed in September 2005); Pl. 56.1 Stmt. ¶ 74 (same)), the court addresses only plaintiff's claim that DOC thereafter failed to inform her how to lift the firearm restriction.

---

[16] Defendants discuss an additional claim of retaliation based on an alleged wrongful transfer ordered by ADW Merritt while plaintiff was still on MMR III status.  (*See* Def. Mem. at 23-25.)  Plaintiff does discuss this incident during her deposition.  (*See* Pl. Dep. 102:19-113:15.)  But plaintiff did not allege that the incident with ADW Merritt was a retaliatory act in either her second amended complaint or in her response to defendants' motion for summary judgment.  (*See* Second Am. Compl. at 11; Pl. Mem. at 1-2, 17-21.)  In fact, plaintiff appears to suggest in her response to defendants' motion that defendants improperly interpreted the retaliation claims to include the incident with ADW Merritt.  (*See* Pl. Mem. at 17-18.)

Plaintiff has not presented sufficient facts to satisfy the second element of the *prima facie* case, i.e. that she suffered a disadvantageous action. *See Richardson*, 532 F.3d at 123. Unlike the requirements for showing an adverse employment action under the substantive provisions of Title VII, "the antiretaliation provision . . . is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Instead, plaintiff needs to only show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citation and quotation marks omitted). Still, plaintiff must show some material adversity, because "petty slights, minor annoyances, and simple lack of good manners" will normally not suffice. *Id.*

Even under this more lenient standard, plaintiff still fails to show sufficient disadvantage to satisfy her *prima facie* case. As explained above, plaintiff concedes that she was able to obtain the necessary information from other sources. (*See* Pl. Aff. ¶¶ 28, 32; Pl. Dep. 101:18-23.) Defendants neither prevented plaintiff from requesting that the firearm restriction be lifted, nor did they deny her firearm privileges once she complied with the necessary requirements to restore her firearm

designation.  The failure to provide this information, without more, would not deter a reasonable employee from making or supporting a claim of discrimination.  Plaintiff fails to show that defendants' actions amounted to anything more than a "minor annoyance[]."  *See White*, 548 U.S. at 68.

The second way plaintiff claims she was retaliated against was in the denial of steady tours, posts, and transfers. (*See* Second Am. Compl. at 11; Pl. Mem. at 17-21.)  Plaintiff also has failed to establish a *prima facie* case of retaliation for these claims.  There is no evidence that these denials, which occurred in 2007, were causally related to her complaints to DOC's EEO Office in October of 2005 or to her complaint to the EEOC in March of 2006.  Plaintiff claims that it was shortly after DOC began investigating her complaints, during the Spring of 2006, that she began to "be denied the posts and transfers [she] requested."  (Pl. Aff. ¶¶ 53-55.)  However, plaintiff has presented no evidence of any requests denied "within a few weeks" of the Spring of 2006, when plaintiff's last complaint was filed.  Plaintiff's "[c]onclusory allegations . . . are insufficient to create a genuine issue of fact."  *Kerzer*, 156 F.3d at 400.

Because plaintiff failed to establish that the failure to provide her with information about how to lift her firearm restriction was sufficiently disadvantageous, or that the

denials of transfers, tours, and posts was causally connected to her complaints of discrimination, she has not satisfied her burden to establish a *prima facie* case of retaliation. Accordingly, defendants' motion for summary judgment on the retaliation claims is granted.

## D. NYCHRL Discrimination and Retaliation Claims

Plaintiff alleges that defendants discriminated against her based on her gender and pregnancy and retaliated against her in violation of NYCHRL. NYCHRL § 8-130 states that the provisions of Title 8, including the provision applicable here prohibiting certain discriminatory practices, "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes" of that law. *See* NYCHRL § 8-130. Guided by this language, courts have recently determined that claims under NYCHRL require "'an independent liberal construction'" and are no longer "co-extensive with [its] federal counterparts." *Loeffler v. Staten Island Univ. Hops.*, 582 F.3d 268, 278 (2d Cir. 2009) (citing to *Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)).

Given this mandate, courts must now develop and apply an independent legal framework whenever analyzing claims brought under Title 8 of the NYCHRL. This legal framework must take into account "the uniquely broad and remedial purposes" of the City law. Development of this legal framework raises "novel and

complex issue[s] of State law," and thus the court has the discretion to decline to exercise supplemental jurisdiction over the NYCHRL claims. *See* 28 U.S.C. § 1367(c)(1). Because the court believes that State courts are better suited to address these new and complex questions of City law, the court declines to exercise jurisdiction over plaintiff's NYCHRL discrimination and retaliation claims pursuant to 28 U.S.C. § 1367(c)(1). Plaintiff's NYCHRL claims are thus dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied with prejudice with respect to (1) plaintiff's Title VII and NYSHRL claim of gender discrimination in the assignment of facilities and posts, and (2) plaintiff's Title VII and NYSHRL claim of pregnancy discrimination in the denial of the Mental Health Officer Post. Defendants' motion for summary judgment is denied without prejudice with respect to plaintiff's Title VII and NYSHRL claim of gender discrimination in the denial of the North South Corridor Post. Defendants' motion for summary judgment is granted with respect to the remainder of plaintiff's Title VII and NYSHRL discrimination and retaliation claims. The court declines to exercise supplemental jurisdiction over plaintiff's NYCHRL claims.

The parties are ordered to engage in good faith settlement negotiations and to schedule a settlement conference

before Magistrate Judge Bloom.  By 11/5/2010, the parties shall
file a joint letter via ECF regarding the outcome of their
settlement efforts and informing the court whether they plan to
engage in further settlement discussions or intend to proceed to
trial.

SO ORDERED.

Dated: Brooklyn, New York
       September 30, 2010

                                    _____
                                            /s/
                                    KIYO A. MATSUMOTO
                                    United States District Judge
                                    Eastern District of New York